IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 17-CV-0641-MSK

DIRK LARSEN,

    Plaintiff,

*v.*

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

    Defendant.

## OPINION AND ORDER REVERSING THE COMMISSIONER'S DECISION

**THIS MATTER** comes before the Court on the Plaintiff's Complaint (**# 1**), the Plaintiff's Opening Brief (**# 12**), the Defendant's Response (**# 13**), and the Plaintiff's Reply (**# 14**). For the following reasons, the Commissioner's decision is reversed and the matter is remanded for further proceedings.

### I.    JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Commissioner under 42 U.S.C. § 405(g).

### II.    BACKGROUND

**A.**    **Procedural History**

Dirk Larsen seeks judicial review of a final decision by the Commissioner denying his claim for disability insurance benefits (DIB) under the Social Security Act. In December 2012, Mr. Larsen filed for DIB, claiming he became disabled in January 2011. Tr. at 168–76. His application was denied at all administrative levels and he now appeals to this Court pursuant to

42 U.S.C. § 405(g).

## B. Factual Background

The Court summarizes only the medical evidence relevant to its decision.

At the time of his alleged onset of disability, Mr. Larsen was 58 years old. Tr. at 170. He was previously employed as a contractor. Tr. at 243. He claimed that he was disabled due to Meniere's Disease (along with hearing loss and tinnitus as a result), blood clots, degenerative disc disease, major depressive disorder, and obesity.

In April 2012, Dr. Richard S. Daarud wrote a letter briefly describing Mr. Larsen's medical issues. Tr. at 408. He diagnosed Mr. Larsen with vertigo due to Meniere's Disease, which causes "marked instability and precludes him from doing his usual occupation, which is physical in nature. He is a fall risk." Tr. at 408. Dr. Daarud also opined that Mr. Larsen is disabled due to this condition because, despite treatment, there is no cure for Meniere's Disease. Tr. at 408.

Also in April 2012, Nurse Practitioner Michelle Fisher assessed Mr. Larsen with regard to mental health issues. Tr. at 333–36. Her handwritten treatment notes mostly contain Mr. Larsen's subjective description of his symptoms. Tr. at 333. N.P. Fisher observed Mr. Larsen to be sad with low energy, motivation, focus, and appetite, but to have no psychosis, hallucinations, delusions, or bizarre behavior. Tr. at 333. She also observed disheveled appearance, psychomotor slowing, poor eye contact, flat affect, cooperative attitude, suicidal ideation, oriented cognition, and fair judgment. Tr. at 335. She prescribed Wellbutrin, with which Mr. Larsen had success ten years prior, and Trazadone. Tr. at 336. She also recommended individual therapy. Tr. at 336. Dr. Daniel Fisher agreed with her assessment. Tr. at 336. Other treatment notes by N.P. Fisher do not reflect Dr. Fisher's concurrence. Tr.

2

at 321–24, 327–28.   For example, no records show concurrence with her assessment that Mr. Larsen's symptoms improved after treatment with Wellbutrin or that Mr. Larsen did not pursue recommended individual therapy.   Tr. at 325–26.   Dr. David Kelsall's treatment notes from June 2012 indicate that he restricted Mr. Larsen from working in hazardous areas or high places. Tr. at 341.

In March 2014, Mr. Larsen was admitted to a hospital for chest pain and a blood clot. Tr. at 379.   Doctors treated him with Coumadin.   Tr. at 377, 379.   He was discharged a week later with instructions to continue taking Coumadin.   Tr. at 373.

In May 2014, Dr. Stuart Lerman, a state-agency nonexamining consultant, completed an RFC assessment based on his review of the medical record.   Tr. at 100–02.   He assessed Mr. Larsen with the following postural limitations: he can climb ramps and stairs frequently but never any ladders, ropes, and scaffolds; he can occasionally balance; and he can frequently stoop, kneel, crouch, and crawl.   Tr. at 100–01.   Dr. Lerman also stated that Mr. Larsen needed to avoid concentrated exposure to noise and workplace hazards like machinery.   Tr. at 101.

In June 2015, Dr. Daarud wrote another letter addressing Mr. Larsen's issues.   Tr. at 486.   He stated that that Mr. Larsen has increased symptoms of dizziness with physical exertion, resulting in spontaneously occurring attacks that led to vomiting and instability.   Tr. at 486.   He also opined that Mr. Larsen had reduced hearing in both ears, worse on the right side. Tr. at 486.   As for functional limitations, Dr. Daarud opined that Mr. Larsen is limited in driving, balancing, and hearing.   Tr. at 486.

**C.    The ALJ's Decision**

In September 2015, the ALJ issued an unfavorable decision to Mr. Larsen.   Tr. at 16–31.

At step one, he found that Mr. Larsen had not engaged in substantial gainful activity from January 1, 2011, through his date last insured of December 31, 2014. Tr. at 21. At step two, the ALJ found that Mr. Larsen had the following severe impairments: Meniere's Disease and sensorineural hearing loss. Tr. at 21. The ALJ also found that the following impairments were not severe: obesity, depression, and back pain. Tr. at 21–22. At step three, he found that Mr. Larsen had no impairment that met or medically equaled the presumptively disabling conditions listed in 20 C.F.R. Part 404, Appendix 1. Tr. at 22. The ALJ found that Mr. Larsen had the residual functional capacity (RFC) to perform medium work with the following limitations: he can lift and carry up to 50 pounds occasionally and 25 pounds frequently; he can sit for up to six hours, and stand or walk for six to seven hours in an eight-hour workday; he cannot balance, climb ladders, or scaffolds, nor can he operate moving machinery or work in loud working environments; and he should avoid working at unprotected heights or with workplace hazards. Tr. at 23. At step four, the ALJ found that Mr. Larsen was unable to perform any of his past relevant work. Tr. at 25. At step five, the ALJ concluded that, considering Mr. Larsen's age, education, work experience, and RFC, he could perform the following jobs in the national economy: meat clerk and courtesy clerk. Tr. at 26.

The ALJ found that Mr. Larsen's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. Tr. at 24. In crafting the RFC, the ALJ gave little weight to Dr. Daarud's first letter, great weight to Dr. Kelsall's treatment-note restriction, and moderate weight to Dr. Daarud's second letter. Tr. at 24–25.

### III. STANDARD OF REVIEW

Though the Court's review is de novo, the Court must uphold the Commissioner's decision if it is free from legal error and the Commissioner's factual findings are supported by

4

substantial evidence. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). Substantial evidence is evidence a reasonable person would accept to support a conclusion, requiring "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The Court may not reweigh the evidence, but it looks to the entire record to determine if substantial evidence exists to support the Commissioner's decision. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

## IV. DISCUSSION

Mr. Larsen argues that the ALJ erred in evaluating the opinions Drs. Fisher, Kelsall, and Daarud; in assessing Ms. Mr. Larsen's credibility; in reviewing which impairments were severe at step two; that the RFC is unsupported by substantial evidence; and in examining the VE at the hearing. Because the Court reverses and remands the decision based on legal error in evaluating medical opinions, it declines to reach the other claims.

### A. Evaluation of Medical Opinions

A treating physician's opinion must be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques *and* is consistent with the other substantial evidence in the record. *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007). In answering these questions, the ALJ must articulate specific, legitimate reasons that describe how the opinion is unsupported by clinical and laboratory diagnostic techniques, or identify the inconsistent evidence in the record. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).

If the answer to either of these inquiries is "No", then the opinion is not accorded controlling weight, but is, instead, assessed for comparative weight relative to other medical opinions. The factors considered for comparative this assessment of medical opinions are:

5

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Allman v. Colvin*, 813 F.3d 1326, 1331–32 (10th Cir. 2016). In applying these factors, the ALJ must make her findings and reasoning sufficiently specific so the weight given is clear to subsequent reviewers. *Langley*, 373 F.3d at 1119.

Here, Mr. Larsen was treated by physician Dr. Daarud, Nurse Practitioner Michelle Fisher (who was supervised by Dr. Daniel Fisher) and Dr. David Kelsall. Dr. Daarud opined that, due to his Meniere's Disease, Mr. Larsen has reduced hearing and is a fall risk because he experiences dizziness during physical exertion. Tr. at 408, 486. Dr. Daarud also opined that Mr. Larsen is limited in driving, balancing, and hearing. Tr. at 486. Dr. Kelsall stated in his treatment records that Mr. Larsen should refrain from working in hazardous areas or high places. Tr. at 341. Dr. Fisher stated in his treatment records that Mr. Larsen suffers from depression and that Wellbutrin appears to improve his symptoms. Tr. at 325–26, 333–36. Mr. Larsen argues that the ALJ erred in not addressing the opinions of Drs. Kelsall and Fisher, and in giving little weight to the opinion of Dr. Daarud.[1] The Commissioner contends that Mr. Larsen has failed to show that the ALJ's decision was not based upon substantial evidence.

Addressing this challenge is complicated by several factors. First, Mr. Larsen does not identify the particular opinions that he contends the ALJ ignored. Second, it appears that many of the purported opinions are actually found in medical notes and reports, and there is a

---

[1] Both the ALJ and Mr. Larsen seem to have confused Dr. Kelsall's statement, the ALJ referring to it as Dr. Daarud's, and Mr. Larsen arguing that nothing from Dr. Kelsall was addressed by the ALJ.

6

distinction between a medical source statement providing an opinion about what a claimant can still do despite severe impairments and medical notes or reports submitted with the opinion. *See* SSR 96-5p, 1996 WL 374183 at *4. Finally, there are no formal functional capacity assessments by treating providers. For example, Dr. Fisher's assessment is found in treatment notes from April 26, 2012. The ALJ properly evaluated this assessment in the context of step two and found Mr. Larsen's depression was not a severe impairment. No challenge is made to that determination. Dr. Kelsall's statement memorialized as a directive in a medical report. The ALJ gave great weight to his statement and incorporated it into the RFC, so any error is harmless.

> With regard to Dr. Daarud, the ALJ stated:
>
> As far as the opinion evidence, the claimant's treating physician, R. Scott Daarud, M.D., provided multiple opinions throughout his treatment. First, in April 2012, he opined that the claimant was disabled by Meniere's disease and precluded from returning to his usual occupation. While Dr. Daarud is correct that the claimant could not return to his past work, the opinion suggests a total preclusion from any work, which is an opinion on a matter reserved to the Commission[er] and is further inconsistent with the evidence of record. This opinion is therefore given little weight.
>
> Then, in June 2012, Dr. Daarud opined that the claimant should avoid working in hazardous areas or at heights. Considering the claimant's history of difficulties with balance, this opinion is given great weight. Finally, in a letter dated June 11, 2015, Dr. Daarud opined that the claimant's dizziness and hearing loss interfered with his balance, hearing, and physical exertion. While this is consistent with the record, the opinion does not provide specific details regarding the claimant's maximum abilities in each of these areas. For this reason, this opinion is given only moderate weight.

Tr. at 24–25 (citation omitted).

The first analytical step in assessing Dr. Daarud's opinions is to determine whether it is controlling. This requires the ALJ to determine whether it is well supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the

7

other substantial evidence in the record. If there is a deficiency in either regard, the opinion is not controlling. At each step, the ALJ is required to identify specific, good reasons for weight given to the opinion. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

Focusing on the second opinion rendered by Dr. Daarud in May 2015, the ALJ both failed to apply the correct legal standard and failed to make findings sufficient to accord Dr. Daarud's opinion less than controlling import. It is apparent that the ALJ did not distinguish between the determination of whether Dr. Daarud's opinion were entitled to controlling weight, and if not, then determine comparative weight. Instead, the ALJ collapsed the required two-step analysis into a single determination of comparative weight due to lack of specificity. This constitutes legal error, but such error is harmless if the ALJ's analysis clearly addresses the issues inherent in the two-step process.

Here, the Decision lacks any findings that Dr. Daarud's opinions were unsupported by medically acceptable clinical and laboratory diagnostic techniques, and it contains an express finding that at least part of the opinions are consistent with the record. Under such circumstances, Dr. Daarud's opinion should have been given controlling weight. The difficulty that the ALJ identifies is with Dr. Daarud's lack of specificity as to restrictions that should be imposed to accommodate these impairments. Such difficulty is not properly addressed by discounting the weight of his opinions, but instead, by seeking clarification and supplementation.

The ALJ has a foundational duty of inquiry to fully and fairly develop the record as to material issues. *Carter v. Chater*, 73 F.3d 1019, 1021 (10th Cir. 1996). In the Ninth Circuit, ambiguous evidence, or the ALJ's own finding that the record is not specific enough to allow for proper evaluation, triggers the ALJ's duty to conduct an appropriate inquiry. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). While an ALJ's obligation in this Circuit is less

8

clear, the ALJ here, when faced with two scant treating-physician opinions, did not seek further clarification or supplementation from Dr. Daarud, nor did he order a consultative examination to fill out the record. Instead, he rejected Dr. Daarud's opinion in a cursory fashion and gave great weight to a nonexamining consultant. Mr. Larsen's Meniere's Disease is a material issue, if not *the* material issue, in his application for DIB. Thus, not only is did the ALJ commit legal error in the evaluation of Dr. Daarud's opinions, the ALJ additionally erred by failing to develop the opinion evidence on the Meniere's issue.

The Commissioner argues that the ALJ's error is harmless because the ALJ accounted for Dr. Daarud's limitations in the RFC. The Court disagrees. As to Dr. Daarud's opinion that Mr. Larsen has difficulty balancing and therefore is prone to falling, the ALJ limited Mr. Larsen from balancing, climbing ladders or scaffolds, and working at unprotected heights. Such restrictions accommodate a fall risk from heights, but they do nothing to address fall risks due to intermittent dizziness experienced while standing on level and stationary surface. It is not at all clear how a prohibition of working in loud environments addresses Mr. Larsen's hearing loss, and there is no accommodation or limitation that addresses the correlation between physical exertion and Mr. Larsen's bouts with dizziness. Thus, the Court finds that the ALJ failed to employ the correct legal standard in assess Dr. Daarud's 2015 opinion as to Mr. Larsen's limitations. This error requires reversal.

## V. CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED AND REMANDED** for further proceedings consistent with this opinion. Judgment shall enter in favor of Mr. Larsen.

Dated this 26th day of March, 2018.

BY THE COURT:

Marcia S. Krieger
Chief United States District Judge